UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CHARLES A. SHARP and JUDY K. SHARP, as joint personal representatives of the Estate of KATIE R. SHARP, and as Legal Guardians of DEVIN K. SHARP, surviving child of KATIE R. SHARP,

    Plaintiffs,

v.      406CV020

WILLIAM SCOTT FISHER, BRYAN H. STRICKLAND, and GEORGE A. ELLIS, in their individual capacities,

    Defendants.

## ORDER

## I. INTRODUCTION

Charles and Judy Sharp brought this 42 U.S.C. § 1983 action on behalf of their deceased daughter Katie and her surviving child against several Georgia police officers in their individual capacities. 406CV020, doc. # 1; # 43 (consolidating companion case, 406CV235, with this case). They allege that Georgia State Trooper William Fisher subjected Katie to an unreasonable seizure in violation of the Fourth Amendment when he attempted to employ a Precision Immobilization Technique ("PIT") maneuver to stop her SUV as she and her passenger fled from South Carolina and Georgia police. The maneuver sent their SUV off of an interstate into a tree-filled ditch, killing them both. The Sharps also bring claims based on the Eighth and Fourteenth Amendments, and they seek to hold Bryan Strickland and George Ellis liable as Fisher's supervisors. The defendants move for summary judgment on all claims.

## II. BACKGROUND

Under F.R.Civ.P. 56, the Court reviews the record evidence in the light most favorable to the nonmoving party -- here, the Sharps. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007). But because that evidence includes three different videos of the incident in question, the Court "views the facts in the light depicted by the video[s]." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007).

Those dashboard videos, shot from three police vehicles, are not challenged on accuracy grounds. *See Scott*, 127 S.Ct. at 1775. The Court will refer to them as the Marvin Video (doc. # 78, attach. 5, exh. 1-2), the Polk Video (doc. # 78, attach. 6, exh. 1-2), and the Strickland Video (doc. # 78, attach. 10, exh. 1-2), as they were shot from the vehicles of South Carolina Officer Wade Marvin, South Carolina Officer William Polk, and Georgia Officer Bryan Strickland, respectively (apparently, Fisher's onboard camera malfunctioned and thus did not capture the chase, doc. # 73 at 139).[1]

### A. What All The Officers Witnessed

On 8/17/04, Marvin and Polk were clocking speeders on I-95 South, 55 miles north of the Georgia border. Doc. # 77 ¶¶ 28-29. Katie Sharp's SUV drove past them at 86 mph in a 70 mph zone, so Marvin pulled out and attempted a traffic stop. *Id.* ¶¶ 30-31. Sharp accelerated and began weaving through traffic on I-95's two lanes, so Marvin notified police dispatch of a pursuit in progress; Polk then pulled out to join the pursuit. *Id.* ¶¶ 31-33.

---

[1] As did the U.S. Supreme Court in *Scott*, the Court has posted these videos online for public access. *See* http://www.gas.uscourts.gov/406cv020/

For the next 45 minutes, Sharp drove erratically at speeds up to at least 107 miles per hour over 75 miles into Georgia, on an interstate highway that in 2005 averaged 50,000-100,000 vehicles per 24-hour period. *See* http://www.dot.state.ga.us/DOT/plan-prog/transportation_data/TrafficFlowMap_Online/htmlfiles/trafficflow_05.pdf (viewed 7/26/07) (inset map of Savannah area showing 65,400 vehicles/day on average on this stretch of I-95 South). During that high-speed chase, the following can be observed (all times from the Marvin Video):

- Sharp constantly weaves through traffic;

- Sharp passes other vehicles in the road's emergency lane, sometimes narrowly missing a parked car, *e.g.*, 15:44:58-45:14; 16:15:54-16:04, or a person standing by a parked car, *e.g.*, 15:49:24-51 (pedestrian at 15:49:42-46);

- Where no emergency lane is present, Sharp resorts to passing cars in the grass that sits alongside Interstate 95, and almost loses control of her car, *e.g.*, 15:42:32-37, 15:47:12-18, 16:01:23-27, 16:04:14-18;

- Sharp swerves back and forth to avoid a rolling roadblock, *e.g.*, 15:53:16-25, 16:10:37-42, 16:17:16-24.

In addition, dispatch informed Strickland that a construction site lay ahead on the interstate, 10-15 miles past Georgia Highway 204. Doc. # 72 at 35; *see generally* doc. # 73 (when asked in detail about the chase, the surrounding circumstances, and why he took the action he did, Fisher never mentions a construction site). By the time the chase ended, it had covered over 75 miles.

**B. What Fisher Witnessed**

On 8/17/04, Fisher was assigned a post in Rincon, Georgia, as was his supervisor, Strickland. Doc. # 77 ¶ 5,6, 71 (defendants' statement of undisputed facts; facts are undisputed by the Sharps' statement (doc. # 89) unless otherwise noted). South Carolina officers notified Georgia that a pursuit on I-95 South was heading for the Carolina/Georgia border. *Id.* ¶ 71. Fisher and Strickland took separate patrol cars (with emergency blue lights and sirens activated), drove to the interstate, and headed north toward South Carolina. *Id.* ¶ 72-73. They saw the chase pass by on I-95, so they crossed the median and joined the chase southbound. *Id.* ¶¶ 74-75.

After speeding south through traffic for a number of miles, Strickland and Fisher reached the pursuit near exit 94 on I-95 (Georgia Highway 204), where the road is three lanes wide. The Carolina/Georgia border is some 20 miles from the point where Fisher initiated contact, so Fisher knew the chase had continued for at least that distance. The best view of what Fisher saw from that point (the point at which a reasonable jury could conclude that Fisher could then view the chase) comes from the Marvin Video:

16:18:35 -- Katie Sharp, in the middle lane, is being chased by Marvin, a short distance behind; Sharp and Marvin change from middle lane to left lane;

16:19:01 -- Marvin moves to the middle lane to allow Fisher to pass;

16:19:24 -- Sharp passes a semi-tractor truck and two smaller van/trucks, and Fisher moves into center lane;

2

16:19:28-32 -- Fisher attempts the PIT maneuver by making contact with the back-right portion of Sharp's SUV; Sharp's vehicle spins 180 degrees and slides across all lanes of traffic into the tree-filled ditch.

Fisher never communicated with the South Carolina officers, and based his decision to perform the PIT maneuver on the 53 seconds he spent observing her driving. Doc. # 73 at 58, 83 (Fisher deposition: "The only thing I knew there was a chase in progress headed towards Georgia on I-95 southbound"; "I had no radio contact with [other police agencies]"). He assumed that Katie had committed "some type of felony, [and that] she had committed some type of serious crime in order for these other agencies to cross over state lines into Georgia." Doc. # 73 at 57. In fact, the sum total of his knowledge is illuminated by this exchange:

> Q. You didn't know what she had done other than she was being chased and she was speeding, did you?
>
> A. I didn't know at that time. That was an assumption that I made based on the fact that these other agencies crossed into the State of Georgia.

*Id.*; *see also id.* at 58 ("A. The only thing I knew there was a chase in progress headed towards Georgia on I-95 southbound").

## III. ANALYSIS

### A. Fourteenth Amendment

A Fourteenth Amendment, substantive due process claim based on a police officer's "conscience-shocking conduct" will only succeed where "a plaintiff can show that the officer had 'a purpose to cause harm unrelated to the legitimate object of arrest.'" *Vaughan v. Cox*, 343 F.3d 1323, 1333 (11th Cir. 2003) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)). Because "police officers are required to make quick judgments about the proper course of action and therefore cannot deliberate before acting, even a showing that the officer's recklessness caused the plaintiff's injury is insufficient to support a substantive due process claim." *Id.* The Sharps do not present any evidence that Fisher had any motivation other than effecting Katie's arrest. Thus, the defendants are entitled to summary judgment on plaintiffs' Fourteenth Amendment claims.

### B. Eighth Amendment

The Eighth Amendment does not protect those who have not yet been tried and convicted. *Graham v. Connor*, 490 U.S. 386, 393 n.6 (1989) (citing *Ingraham v. Wright*, 430 U.S. 651, 671, n. 40 (1977)); *see Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (Eighth Amendment does not protect pretrial detainees). Therefore, the defendants are also entitled to summary judgment on the plaintiffs' Eighth Amendment claims. That leaves only their Fourth Amendment claims and defendants' qualified immunity defense.

### C. Fourth Amendment

#### 1. *Supervisorial Liability*

Strickland and Ellis are entitled to summary judgment. Whether a policy encouraged or discouraged PIT maneuvers, it simply does not matter in this context. *See Abney v. Coe*, ___ F.3d ___, 2007 WL 1893378 at * 7 (4th Cir. 7/3/07). A policy that leaves individual officers the discretion to perform PIT maneuvers does

3

not violate the Fourth Amendment because whether such a maneuver can legally be performed depends on the circumstances surrounding a given chase, *Scott*, 127 S.Ct. at 1777-78, which will only be known by the officer involved in the chase.

Here, neither Ellis nor Strickland knew the circumstances surrounding Fisher's pursuit. *See* Strickland Video (Katie's SUV only comes into view after Fisher initiates contact). They trusted Fisher to take the surrounding circumstances into account in deciding whether to perform the PIT maneuver. Depending on those circumstances, performing the maneuver could have been reasonable or unreasonable. Because they did not know the circumstances to make such a judgment themselves, leaving the decision whether to perform the PIT maneuver to Fisher's discretion did not violate Katie's Fourth Amendment rights.

### 2. *Qualified Immunity*

The qualified immunity defense requires the Court to first resolve the threshold question whether the facts, taken in the light most favorable to the party asserting injury, show that the officers' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Only if it finds a violation of a constitutional right does the Court take the next, sequential step of determining whether the right was clearly established in light of the specific context of this case. *Id.*; *Scott*, 127 S.Ct. at 1774. The Court now turns to the issue whether Fisher's PIT maneuver was reasonable.

### 3. *Objective Reasonableness*

Terminating a car chase by striking a fleeing car constitutes a "seizure," and whether effecting a seizure violates the Constitution turns on whether striking the vehicle was "objectively reasonable." *Scott*, 127 S.Ct. at 1776. No bright-line rules based on whether striking the other vehicle constitutes "deadly force" guide the inquiry; instead the Court must "slosh [its] way through the factbound morass of 'reasonableness.'" *Id.* at 1778.

In judging reasonableness in the context of a car-chase seizure, a court "must consider the risk of bodily harm that [the officer's] actions posed ... in light of the threat to the public that [the officer] was trying to eliminate." *Id.* Once the facts are established, weighing the facts and circumstances to determine whether a seizure was "objectively reasonable" is a job for judges, not juries, since the question of Fourth Amendment reasonableness "is a pure question of law." *Id.* at 1776 n. 8. *But see id.* at 1781 (Stevens, J. dissenting) (Were actions in a particular case objectively reasonable? "Depending on the circumstances, the answer may be an obvious 'yes,' an obvious 'no,' or sufficiently doubtful that the question of the reasonableness of the officer's actions should be decided by a jury, after a review of the degree of danger and the alternatives available to the officer").

Weighing reasonableness in *Scott*, the Court first noted that striking a fleeing car from behind no doubt creates a "high likelihood of serious injury or death," but not the same "near *certainty* of death posed by, say, shooting a fleeing felon in the back of the head." *Id.* at 1178. On the other side of the balance, the videos in *Scott* established that the fleeing felon drove in a manner that endangered human life. *Id.* at 1775-76. The Court therefore weighed "the perhaps lesser probability of injuring or killing numerous bystanders" versus "the perhaps larger probability of injuring or killing a single person." *Id.* at 1778. Given those

circumstances, a "ramming seizure" was reasonable because the single person endangered by the ramming (the fleeing driver) was culpable, whereas the numerous bystanders were innocent. *Id.*; *see also Miller v. Jensen*, 2007 WL 1574761 at *6 (N.D. Okla.5/29/07); *Abney*, 2007 WL 1893378 at * 6.

But unlike in *Scott*, *Miller*, and *Abney*, where the only person threatened by the officer's action was the culpable driver, a jury here could conclude that Fisher's actions endangered not only the culpable driver, but also the (culpability unknown) passenger *and* the innocent drivers and passengers of the vehicles Fisher passed seconds before pushing Katie's SUV. If, as Fisher planned, the SUV came to rest in the roadway (doc. # 73 at 66), the semi-truck and other vehicles directly behind them traveling at a similarly-high rate of speed would have no choice but to swerve perhaps (if not probably) uncontrollably to avoid a direct collision. A jury could easily determine the precise likelihood viewing the Strickland and Polk Videos, which show the proximity and speed of the trailing trucks at the time Fisher initiated contact.

Next, the Court must determine the governmental interests at stake. *Scott*, 127 S.Ct. at 1778. Here, as in *Scott*, the governmental interest cited is Fisher's belief that Katie's driving constituted an actual and imminent threat to the public.

But this reveals another important distinction from *Scott*. If the Court views the governmental interests from Fisher's point of view, the only information the reasonable officer would have is: (1) a chase from South Carolina had entered Georgia, traveling at high speeds for some 20 miles (the distance between the border and Georgia Highway 204), doc. # 73 at 58 ("The only thing I knew there was a chase in progress headed towards Georgia on I-95 southbound"); (2) the fleeing car was passing other cars in the left lane, Marvin Video at 16:18:35-16:19:32; and (3) the fleeing car was not responding to the patrol car's flashing blue lights and siren.

If, on the other hand, the governmental interests are determined by the collective knowledge of all Georgia and South Carolina officers, even though it is conceded that such knowledge was not communicated to Fisher, a reasonable officer would know that: (1) a 75-mile long chase from South Carolina had entered Georgia; (2) the individual was driving erratically, often passing in the emergency lanes (narrowly missing a pedestrian at one point and a parked car later), swerving to avoid police attempts to block the car; and (3) the chase was approaching a construction site where the road narrowed from three lanes to two.

This inquiry is troubling because many Fourth Amendment based cases involve an unlawful stop *and/or* excessive force in conjunction with the stop. Not only does the reasonableness inquiry merge in those cases, *see Marshall v. West*, 2007 WL 1540231 at * 12 (M.D.Ala. 5/24/07) (unpublished) ("a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim" (quotes and cite omitted)), but courts inquire whether the traffic-stopping (or PIT-maneuvering) officer had reasonable suspicion if not probable cause to make the stop in the first place. *That* inquiry typically invokes the "collective knowledge" doctrine -- that probable cause can be established by the collective knowledge of communicating officers, rather than the sole knowledge of the individual officer taking action. *U.S. v. Goddard*, 312 F.3d 1360, 1364 (11th Cir. 2002) ("Observations and other information supplied by officers involved in a

common investigation can, taken together, create probable cause for a search"). The "collective knowledge" distinction here obviously was not relevant in *Scott* nor in other *one*-officer PIT-maneuver cases like it.

In fact, the Court has located only excessive-force cases where the force-using officers had actual, as opposed to *imputed* knowledge of the facts on which the deployed force was justified. *See, e.g., Pace v. Capobianco*, 283 F.3d 1275, 1281-82 (11th Cir. 2002); *see also Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). Thus, the Court will not impute the South Carolina officers' knowledge to Fisher in resolving this issue.

For summary judgment purposes, then, the knowledge a reasonable officer in Fisher's position could claim is that (a) Katie had been pursued from South Carolina into Georgia at high speeds for a distance of at least 20 miles; and (b) she refused to obey clear siren/flashing light commands to pull over. Thus the question becomes whether the governmental interest in stopping a sustained but controlled high-speed chase outweighs the substantial risk of causing serious bodily harm to a culpable driver, passenger of unknown culpability, and several innocent interstate travelers.

The Court is loathe to discount the risks associated with even a controlled highway police chase that proceeds for more than a short distance. Lurking beneath the fragile shell of perceived control lies, in all police chase cases, a person fleeing police; to what lengths that person will go to avoid apprehension is unknown. In car chase cases, unlike unarmed and on-foot chases, the fleeing person controls a large and deadly object, so the unknown variable -- how far they are willing to go to avoid apprehension -- takes on substantially more significance. Furthermore, even if a fleeing driver would not go to public-endangering lengths to avoid apprehension, any of the numerous potential obstacles on a busy interstate highway could shatter her control and lead to disaster before police could respond.

Finally, it cannot go unnoticed that in reality the instant chase was *uncontrolled*, though Fisher did not know that on the summary judgment facts. Fisher took action to eliminate the threat Katie posed to the public; even if her driving was controlled from Fisher's point of view, he knew she was willing to run from the police in a large SUV for long distances, and he could assume -- once she continued her flight for more than a short distance -- that she might lose control or take public-endangering evasive action.

Yet, the Court also is loathe to hold that the Fourth Amendment has nothing to say where police kill a recalcitrant driver, the driver's passenger, and endanger nearby innocent travelers solely to end what was, from Fisher's point of view, a sustained but controlled chase. Fisher and Katie were not alone on that road; indeed, Katie was not alone in her car. Moreover, whatever the underlying possibilities and assumptions, Fisher did not see or hear of *any* public-endangering, evasive action or out-of-control driving by Sharp. His actions suggest he felt he had carte blanche to "take out" Sharp by whatever means necessary solely because she would not pull over.

That, the Court must conclude, is objectively unreasonable and thus violates the Fourth Amendment. The governmental interest in stopping a recalcitrant but controlled driver does

not justify taking action that puts that driver, any passengers, and numerous other travelers at substantial risk of serious harm. Though an officer can assume that a controlled, fleeing driver poses a serious threat to the public in the form of public-endangering evasive action or a loss of control, it is unreasonable for him to take his own public-endangering action before he sees or hears information that corroborates that assumption. Because the summary-judgment facts establish a Fourth Amendment violation, the Court must proceed to *Saucier*'s second inquiry: "whether the right was clearly established." 533 U.S. at 201.

### 4. *Clearly Established Law*

Police officers are not held liable for every possible constitutional violation. Officers are only held liable for actions that violate *clearly established* constitutional law. This requirement is even more important in an excessive force case because "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97.

"[I]t is plaintiff's job to show 'that the defendant's actions violated clearly established constitutional law.'" *Dartland v. Metropolitan Dade Cty.,* 866 F.2d 1321, 1322 (11th Cir. 1989) (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)). "[Plaintiff] cannot persuade the court that the law is clearly established by making general, conclusory allegations of a constitutional violation or by stating broad legal truisms.... The court must be convinced of the existence of a clear, factually-defined, well-recognized right of which a reasonable [government actor] should have known." *Id.* at 1322-23; *accord Brosseau v. Haugen,* 543 U.S. 194, 198-99 (2004).

Here, the Sharps do not raise a single argument or cite a single case tending to show that stopping a recalcitrant but controlled driver by initiating a PIT maneuver was a clearly established violation of the Fourth Amendment in 8/04; their response brief simply ignores the issue. Defendants cite *Vaughan,* 343 F.3d 1323,[2] as adverse precedent, but argue that it does not show that Fisher's actions were clearly a violation of the Constitution at the time those actions occurred, and the Sharps raise no counter-argument. Doc. # 76 at 26. Because the Sharps fail to cite *Vaughan,* much less argue how it (or any other case) shows Fisher's violation of the Constitution was clearly established, they have not carried their qualified immunity burden, so all defendants are entitled to qualified immunity.

Even if the Sharps raised a *Vaughan*-based argument, there nevertheless is a clear distinction between ramming a car from behind and actions causing "a near *certainty* of death [like] pulling alongside a fleeing motorist's car and shooting the motorist." *Scott,* 127 S.Ct. at 1776 (citing *Vaughan,* 343 F.3d at 1326-27). Because *Vaughan* involved shooting into the cab of a moving vehicle, it would not have provided clear notice to Fisher about the constitutionality of his attempted PIT maneuver

---

[2] *Vaughan* is no longer good law after *Scott.* Under *Vaughan,* the issue of reasonableness is a jury issue. 343 F.3d at 1330 ("We conclude that a reasonable jury could find, under Vaughan's version of the facts, that Deputy Cox's use of deadly force to apprehend Vaughan and Rayson was unconstitutional"). That is no longer true. *Scott,* 127 S.Ct. at 1776 n. 8. *Vaughan* also applied the bright-line deadly force test specifically rejected in *Scott,* 127 S.Ct. at 1778. Though *Vaughan* is incorrect and therefore not clearly established constitutional law now, it was clearly established constitutional law at the time of this incident.

7

here.

## IV. CONCLUSION

The parties filed a consent motion to dismiss defendants J.J. Durrence, James Butler, Jason Riner, Kirk McGlamery, and William Hitchens without prejudice. Doc. # 88. That motion is ***GRANTED***. In addition, the Court ***GRANTS*** the defendants' summary judgment motion. Doc. # 74. The Complaint of plaintiffs Charles and Judy Sharp is therefore ***DISMISSED WITH PREJUDICE***.

This 26th day of July, 2007.

*[signature]*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA